BOTAI CORPORATION, N.V., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
BOTAI CORP., N.V. v. COMMISSIONER
Docket No. 1842-88
United States Tax Court
T.C. Memo 1990-475; 1990 Tax Ct. Memo LEXIS 517; 60 T.C.M. (CCH) 681; T.C.M. (RIA) 90475; August 30, 1990, Filed *517 Decision will be entered for the respondent. William H. Newton, III, for the petitioner. John F. Hernandez, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 932,189 in petitioner's Federal income tax for 1983. Initially, we must determine the character of the gain (capital gain, as respondent contends, or ordinary income, as petitioner contends) realized by petitioner from the sale of a note it received in connection with the sale of its interest in Florida real estate. If such gain is determined to be ordinary income, then we must decide whether the gain escapes United States taxation by virtue of article 22 of the 1975 United States-United Kingdom *519 Income Tax Treaty (U.S.-U.K. Treaty), Convention for the Avoidance of Double Taxation, Dec. 31, 1975, United States-United Kingdom, art. 22, 31 U.S.T. 5668, 5685, T.I.A.S. No. 9682, which, in turn, depends upon whether petitioner obtained residency in the United Kingdom prior to the sale of the note. FINDINGS OF FACT Some of the facts have been stipulated and are so found. So much of the stipulation of facts and exhibits attached thereto as we find relevant are incorporated herein by this reference. Botai Corporation, N.V. (petitioner) was incorporated in Curacao, Netherlands Antilles, on July 28, 1980; it was dissolved on June 30, 1983. Petitioner's sole shareholder since its inception was Svanholmen, Limited, a Cayman Islands corporation. Petitioner alleges that its principal office at the time the petition was filed (January 28, 1988) was at 150 Regent Street, London, U.K. We find that at the time the petition was filed, petitioner was a shell corporation conducting no business affairs. Petitioner filed its 1983 tax return (Form 1120F, U.S. Income Tax Return of a Foreign Corporation), its final return, with the IRS Philadelphia Service Center on November 8, 1984. *520 Thus, pursuant to section 7482(b)(1)(B), [1] jurisdiction to review our decision in this case lies with the Court of Appeals for the Third Circuit. Petitioner was established inter alia to acquire and develop real property situated outside the Netherlands Antilles and to engage in international trade. On August 14, 1980, petitioner and Borroto, London, Koroglu Company (BLK), a Florida corporation, formed a partnership known as 1221 Brickell Developers (the Partnership). (The shareholders of BLK are Wilfredo Borroto, I. Edward London, and Hahki Koroglu. Messrs. Borroto and Koroglu are architects; Mr. London is a realtor. Messrs. Borroto and London have successful track records in real estate development and marketing.) Petitioner held a 49-percent interest in the Partnership; BLK held a 51-percent interest. BLK contributed land (which it had acquired in June 1980 from Zarkin, N.V.) located *521 at 1221 Brickell Avenue, Miami, Florida (the Brickell Property), valued at $ 4.5 million, subject to liabilities of $ 3.3 million to the Partnership; petitioner contributed $ 1.2 million in cash. The purpose of the Partnership was to design and construct a 35-story office condominium tower on the Brickell Property and to market the office condominium units (the Brickell Property project). Real estate brokerage services for sale of the office condominium units were to be performed by Mr. London through his real estate company. Substantial developmental activities (preparation of plans, studies, tests, and analyses) were undertaken and implemented by the Partnership in connection with the development of the Brickell Property project. In this regard, architectural services including the preparation of architectural plans were performed by Urbancore International, Inc. (Urbancore). (Urbancore is a Florida corporation of which Messrs. Borroto and Koroglu are the sole shareholders.) Soil bearing and wind tunnel tests were performed, an engineering survey was prepared, and building permits were obtained. Several existing structures on the property were demolished. Condominium documents *522 were prepared on behalf of the Partnership, and the sale of office condominium units were promoted. The Partnership sought construction financing. After being turned down by several financial institutions, petitioner obtained a commitment from Chemical Bank on March 6, 1981. As a condition to obtaining a $ 25,000,000 construction loan from Chemical Bank, the Partnership had to presell a minimum of 75 percent of the condominium units at an aggregate sales price of at least $ 32 million. Rising interest rates at the time -- in August 1980, the prime interest rate was 11-1/4 percent and by June 1982, the prime interest rate rose to 16 percent -- had a chilling effect on sales of the units which, in turn, precluded the Partnership from meeting the 75-percent pre-construction sale requirement. Thus, the desired construction financing fell through, and the Partnership was unable to secure alternate financing. The Partnership's plan to construct the office tower and sell office condominium units was abandoned sometime in 1981. Prior to February 1982, the Partnership, Erich Lasowsky (Lasowsky), and David Zaidner (Zaidner) began negotiations regarding the sale of the Brickell Property. *523 Lasowsky and Zaidner (both Swiss investors) represented Namora, N.V. (Namora), a Netherlands Antilles Corporation. On February 12, 1982, the Partnership and Namora (with Lasowsky as Trustee) reached and signed an Agreement of Purchase and Sale for the Brickell Property, the Urbancore architectural plans, and building permits; closing was scheduled to occur on June 7, 1982. The purchase price was $ 15,750,000, payable $ 800,000 as a deposit and $ 4,950,000 in cash and a $ 10,000,000 note at closing. Namora's note bore interest at the rate of 14 percent per annum, payable semi-annually. Principal was payable in four equal installments of $ 2,500,000 cash on October 7, 1983, December 7, 1983, April 7, 1984, and June 7, 1984. The note was secured by a mortgage on the Brickell Property. Following the execution of the Agreement of Purchase and Sale (on June 21, 1982), BLK and petitioner took appropriate steps to liquidate the Partnership and to distribute its assets to petitioner and BLK. In accordance therewith, on June 21, 1982, the Partnership conveyed the Brickell Property, and transferred the architectural plans and building permits, to petitioner and BLK in proportion to their *524 respective partnership interests. Concurrently with the transfer, on June 21, 1982, closing for the sale of the Brickell Property to Namora took place in Curacao. Petitioner and BLK in their individual capacities conveyed the property and transferred architectural plans and permits to Namora. As owner of an undivided 49-percent interest in the property sold to Namora, petitioner received $ 2,817,500 in cash and a promissory note in the principal amount of $ 4.9 million, or a total of $ 7,717,500. Petitioner placed a value of $ 3,000,000 on the Urbancore architectural plans that were sold with the Brickell Property to Namora. Based on petitioner's valuation of the assets sold, approximately 81 percent of the $ 15,750,000 purchase price was deemed attributable to the Brickell Property. After the sale of the Brickell Property, petitioner conducted no business activities in the United States or elsewhere. On February 8, 1983, its sole shareholder (Svanholmen, Limited) caused an extraordinary meeting of shareholders to be held in Curacao. At the meeting, petitioner was authorized to do the following in an attempt to obtain residency in the United Kingdom in order to escape U. *525 S. taxation: (1) Register with the registrar of companies in the United Kingdom as a resident company; (2) Transact business in the United Kingdom; and (3) Open offices in the United Kingdom, including the signing of lease agreements. On November 1, 1983, petitioner executed a lease to open a business office at 150 Regent Street, London. The purported nature of petitioner's business in the United Kingdom was "market consultancy." Petitioner did not conduct any business activities in the United Kingdom. Petitioner did not have assets or employees in the United Kingdom and was never managed or controlled by a U.K. resident. All the purported activities of petitioner in the United Kingdom were in reality a charade, designed to give credence to petitioner's claim that it was a resident of the United Kingdom. Petitioner was managed and controlled outside the United Kingdom. On May 25, 1983, petitioner sold the $ 4.9 million note it had received from Namora for $ 5 million. Petitioner did not pay income tax in the United States, United Kingdom or Netherlands Antilles on the gain realized from the sale of the Namora note. OPINION We must first decide whether petitioner *526 realized capital gain or ordinary income on the sale of the Namora note in 1983. Respondent argues that the gain realized from the sale of the Brickell Property to Namora constituted capital gain since the property sold (land) was a capital asset. Petitioner, on the other hand, characterizes such gain as ordinary income, arguing that the gain resulted from the sale or exchange of property (the Brickell Property, architectural plans, and building permits) of a kind which would be included in petitioner's inventory, or held primarily for sale to customers in the ordinary course of its trade or business. The Omnibus Reconciliation Act of 1980, Pub. L. 96-499, 94 Stat. 2599, added a provision that taxes foreign persons (including foreign corporations) who sell U.S. real estate after June 18, 1980. Sec. 897. [2] The purpose of section 897(a) is to tax nonresident aliens and foreign corporations on the disposition of U.S. real property interests, whether the gain is characterized as capital gain or ordinary income. Omnibus Reconciliation Act of 1980, H. Rept. 96-1479 (Conf.) (1980), 1980-2 C.B. 575, 583-585. Thus, petitioner is subject to U.S. income tax under section 897(a) *527 by virtue of the fact that it was a foreign corporation (incorporated in the Netherlands Antilles) at the time it sold its interest in the Brickell Property on June 21, 1982. Section 1.897-1(d)(2)(ii)(A), Income Tax Regs., provides that "If an installment obligation constitutes an interest other than solely as a creditor then the receipt of each payment shall be treated as the disposition of an interest in real property that is subject *528 to section 897(a) to the extent of any gain required to be taken into account pursuant to section 453." Petitioner did not elect out of installment sale treatment under section 453; thus, within the purview of section 897, it did not possess an interest in real property "solely as a creditor." The disposition of that interest is therefore required to be taken into account pursuant to section 453. Accordingly, pursuant to section 1.897-1(d)(2)(ii)(A), Income Tax Regs., the Namora note constitutes a U.S. real property interest and the sale of such note by petitioner triggered gain under sections 897(a) and 453B. In May 1983, petitioner sold the Namora note for a premium. Such sale triggered a gain of $ 3,337,283. [3] Under section 453B(a), the character of the gain upon petitioner's disposition of the note is based upon the character of the sale of the underlying asset, i.e., the Brickell Property. It is therefore necessary to decide whether the sale of the Brickell Property resulted in capital gain or ordinary income. Resolution of this issue turns on whether such property constituted a capital asset. *529 Under section 1221, a capital asset is defined as property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. This statutory provision differentiates between the "profits and losses arising from the everyday operation of a business" on the one hand, Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955), and "the realization of appreciation in value accrued over a substantial period of time" on the other, Malat v. Riddell, 383 U.S. 569, 572 (1966). The term "primarily" as used in section 1221(1) means "of first importance" or "principally." Malat v. Riddell, supra at 569. The question is factual, to be determined on a case-by-case approach. It is necessarily one of intent. While the original intent is a factor to be considered, the intent at the time of sale is determinative. Redwood Empire Savings and Loan Association v. Commissioner, 628 F.2d 516, 518 (9th Cir. 1980), *530 affg. 68 T.C. 960 (1977); Biedermann v. Commissioner, 68 T.C. 1, 11 (1977); Eline Realty Co. v. Commissioner, 35 T.C. 1, 5 (1960). In determining a taxpayer's intent, and therefore the character of the gain, we have looked at a number of factors which include: the nature and purpose of the acquisition of the property and the duration of the ownership; the extent and nature of the txpayer's efforts to sell the property; the number, extent, continuity, and substantiality of the sales; the extent of subdividing, developing and advertising to increase sales; the use of a business office for the sale of the property; the character and degree of supervision or control exercised by the taxpayer over the representative selling the property; and the time and effort the taxpayer habitually devoted to the sale. United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969). See also Biedenharn Realty Co., Inc. v. United States, 526 F.2d 409, 414-415 (5th Cir. 1976). The parties agree that the original intent of the Partnership was to construct a 35-story office condominium tower on the Brickell Property and to *531 market the office condominium units. However, when shortly after the Partnership was formed market interest rates climbed sharply, the Partnership was unable to presell 75 percent of the condominium units, a prerequisite to obtaining construction financing. Therefore, the proposed condominium office building could not be constructed. The project was abandoned, and no additional development activity occurred, prior to the February 12, 1982, sale to Namora. Subsequent to abandoning the project, the assets of the Partnership were distributed to the partners upon its liquidation. At the time the Brickell Property was sold, the Partnership was not engaged in the trade or business of selling individual condominium offices; such development plans had been abandoned before any meaningful number of sales materialized. Cf. Todd v. Commissioner, 77 T.C. 246 (1981), affd. per curiam 682 F.2d 207 (9th Cir. 1982). Since the Partnership had a potential business which never materialized, it sold the undeveloped real estate. Although petitioner and BLK realized a significant gain on the transaction, it was not a gain realized from the sale of property held for sale *532 to customers in the ordinary course of business. Thus, at the time of sale, the Brickell Property ceased to be held for sale to customers in the ordinary course of a trade or business. The gain was capital in nature. Consequently, the gain realized on the sale of petitioner's installment note is likewise a capital gain. Sec. 453B(a). We have considered petitioner's other arguments (including its argument that the sale of the Brickell Property, architectural plans, and building permits to Namora constituted a "bulk sale of inventory") and find them to be without merit. Having concluded that the gain on the sale of the note is a capital gain, petitioner is not entitled to avail itself of the benefits of the U.S.-U.K. Treaty because it only exempts from U.S. taxation gain which is characterized as ordinary income under U.S. domestic law. [4] Even assuming, arguendo, that the gain to petitioner was ordinary, it would still have to prove, among other things, that it was a valid U.K. resident to be eligible for benefits under the U.S.-U.K. Treaty. In order to establish U.K. residency under the U.S.-U.K. Treaty, petitioner must prove that it was managed and controlled in the United *533 Kingdom. See U.S.-U.K. Treaty, Art. 4(1)(a)(ii). We find that petitioner is not eligible for the benefits under the U.S.-U.K. Treaty. Petitioner was neither managed nor controlled in the United Kingdom. [5] It did not have assets or employees in the United Kingdom and any activity which it may have had in that country was at the direction and/or control of a non-U.K. resident. *534 For completeness, we note that the U.S.-Netherlands Antilles Tax Convention would also subject petitioner, a Netherlands Antilles corporation, to taxation in the United States. [6]
To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. Section 897 provides: (a) GENERAL RULE -- (1) TREATMENT AS EFFECTIVELY CONNECTED WITH UNITED STATES TRADE OR BUSINESS. -- For purposes of this title, gain or loss of a nonresident alien individual or a foreign corporation from the disposition of a United States real property interest shall be taken into account -- * * * (B) in the case of a foreign corporation, under section 882(a)(1), as if the taxpayer were engaged in a trade or business within the United States during the taxable year and as if such gain were effectively connected with such trade or business.↩
3. The parties agree that the gain is comprised of $ 3,237,283 from the sale of petitioner's interest in the Brickell Property and $ 100,000 from the note premium.↩
4. Under article 13 of the U.S.-U.K. Treaty, U.S. domestic law is to be applied to determine whether the gain realized is capital gain or ordinary income. Convention for the Avoidance of Double Taxation, Dec. 31, 1975, United States-United Kingdom, art. 13, 31 U.S.T. 5668, 5682, T.I.A.S. No. 9682. See also section 1.897-1(d)(2)(ii)(A), Income Tax Regs.↩
5. We note that, in general, section 897 overrides treaties which would otherwise cause the nonrecognition of such gain. However, there were special rules which allowed treaties to take precedence until January 1, 1985. Omnibus Reconciliation Act of 1980, Pub. L. 96-499, sec. 1125, 94 Stat. 2599, 2690 (1980). Having concluded that petitioner cannot avail itself of the U.S.-U.K. Treaty, we need not decide whether the Treaty overrides section 897(a).↩
6. Article V of the convention states: "Income of whatever nature derived from real property and interest from mortgages secured by real property shall be taxable only in the Contracting State in which the real property is situated." Convention with Respect to Taxes, Apr. 29, 1948, United States-The Netherlands, art. V, 62 Stat. 1757, 1760, T.I.A.S. 1855, as supplemented by Protocol Supplementing the Convention of April 29, 1948, June 15, 1955, United States-The Netherlands, 6 U.S.T. 3696, T.I.A.S. No. 3366 and Protocol Supplementing the Convention of April 29, 1948, Oct. 23, 1963, United States-The Netherlands, 15 U.S.T. 1900, T.I.A.S. No. 5665.↩